## Dugan *v.* Pennsylvania Railroad Company, Appellant.

Argued May 24, 1956.  Before STERN, C. J., JONES, BELL, CHIDSEY and MUSMANNO, JJ.

*Philip Price,* with him *Robert M. Landis* and *Barnes, Dechert, Price, Myers & Rhoads,* for appellant.

*B. Nathaniel Richter,* with him *Charles A. Lord* and *Richter, Lord & Levy,* for appellees.

OPINION BY MR. JUSTICE CHIDSEY, November 12, 1956:

This is an action in trespass brought on behalf of Daniel Dugan, a minor, by his parents and by them in their own right to recover damages for serious injuries which the minor sustained from an overhead electric power line when he climbed to the top of a train of the defendant Pennsylvania Railroad Company, stopped temporarily at a signal on one of its main line tracks. The jury returned a verdict in favor of the minor plaintiff for $40,000 and for his parents in the sum of $10,-000. The defendant filed a motion for a new trial which was withdrawn and a motion for judgment non obstante veredicto which was dismissed by the court below. From the final judgment entered on the verdicts for the plaintiffs, defendant has appealed.

The proper determination of this case depends on the application of §339 of the Restatement, Torts, to the evidence presented at the trial. The area where this accident occurred may be described as follows: On 67th Street between Elmwood Avenue on the south and Woodland Avenue on the north, in the City of Philadelphia, there is a bridge which goes over the defendant's electrified four-track main line between New York and Washington, on which freight and passenger

tracks at this point run east and west. On the east side of 67th Street as one proceeds in a northerly direction towards the bridge the John Bartram High School is located. Immediately to the north of the school is a high cyclone fence owned and maintained by the Philadelphia Electric Company. This fence which runs up to the bridge, separates the school property from a strip of land, between 40 and 46 feet wide, owned by the electric company between 66th and 67th Streets on the Elmwood Street side of the railroad right-of-way, and runs up to the bridge. On the north side and below the electric company's property is the railroad right-of-way which extends 50 feet, north and south, from the center line of the four tracks. For some time prior to the accident there had been a hole in the gate of the electric company's fence and the gate, which is immediately adjacent to 67th Street, was sometimes left open. Just inside of the fence and opposite the gate is a 63 foot high tension tower owned by the Philadelphia Electric Company. On the steep banks leading down to the railroad tracks are hedges and undergrowth where, according to plaintiffs' evidence, children frequently played. Immediately east and next to the abutment of the bridge is a concrete sluice leading partway down the embankment. Bridges for pedestrians and vehicles cross the tracks overhead at 71st, 70th, 67th, 65th, 63rd and 62nd Streets, and a foot bridge crosses at 66th Street. On both sides and on the street level of the 67th Street bridge are high, solid sheet metal fences which appellees admit in their brief made it impossible for anyone to reach the railroad's electrified, catenary wires running underneath the bridge. On these metal fences are signs that say "danger, live wire, keep off". From 160 to 200 passenger and freight trains—one every nine minutes—daily pass in both directions on the rail-

road's tracks at this point at speeds up to 75 miles per hour. The two northernmost tracks are used for trains proceeding toward Washington, while the two southernmost tracks are for trains moving toward the center of Philadelphia. Train movements in this area are controlled by defendant's signal tower operator at Brill Tower in the vicinity of 61st Street. Because of train movements in and out of the Grays Ferry yard area which is to the east of Brill Tower, trains on the second track going toward Philadelphia are sometimes stopped at the signal bridge near 62nd Street. Evidence adduced by plaintiffs showed that when and how long trains might be stopped in transit by the Brill Tower operator was unpredictable and depended on conditions as they arose. During the month immediately preceding the accident the train in question, known as ME-2, passed under the 67th Street bridge practically daily and was delayed six times for periods of 8, 11, 14, 17, 44 and 59 minutes.

On the day of the accident, a Saturday afternoon, the injured minor, who was 11½ years old, left his home with his 8-year old brother for the purpose of going to the movies. They walked north on 67th Street until reaching the 67th Street bridge where they climbed through the hole in the electric company's gate and played around the hedges and the concrete sluice for approximately one-half an hour which, according to their testimony, they had done on a number of occasions before. A long freight train, ME-2, consisting of 61 cars and extending about three-fifths of a mile in length, was standing on the second track. The minor plaintiff could not see either end of it from where he was standing at the foot of the 67th Street bridge. This freight train was temporarily stopped because of train movements ahead for approximately 44 minutes. De-

siring to cross the tracks so as to continue on to the movies, the minor plaintiff crossed over the first track and climbed up the side ladder of one of the boxcars located one or two car lengths east of the bridge. Arriving on top, he pointed to the overhead catenary wire, which was approximately 19 feet above the track level carrying 11,000 volts, and warned his brother not to fool around with it. At this point, it was testified, a spark jumped or arced from the wire to the plaintiff's wrist, inflicting serious and permanent injuries. There were no witnesses to the accident except the minor plaintiff and his little brother.

At the trial, in addition to the above facts, the testimony offered by the plaintiffs, which must be interpreted most favorably to them, disclosed that for several years children had frequently played on the embankment next to the 67th Street bridge, hiding in the hedges, digging holes, and sliding down the concrete sluice. There was also testimony from which the jury could find that children sometimes crossed over the top of boxcars standing at this point.[1] The minor plaintiff, although described by his attending physician, a witness on his behalf, as a "very brilliant child", testified that he had never heard of a live wire and that he knew nothing about the ability of electricity to arc from such a wire.[2]

---

[1] The testimony in this regard chiefly relied upon by plaintiffs' counsel was that of two neighborhood witnesses which was in direct contradiction of prior written statements made by them following the accident that they never saw children on the top of or playing around cars stopped in the vicinity.

[2] He admitted that his father had told him that electricity was dangerous and that he should never put his hand inside of an electric socket. He also admitted that he knew he should not have been at the place where he was injured because his parents had told him not to go near the railroad tracks; and that he knew "it was a lot safer to go over the bridge".

To establish defendant's liability, the plaintiffs seek to bring the case within the rule set forth in §339 of the Restatement, Torts. This section of the Restatement supersedes and supplants the doctrine of "attractive nuisance" and the "playground rule": *Thompson et al. v. Reading Company,* 343 Pa. 585, 23 A. 2d 729; *McGill et al. v. United States,* 200 F. 2d 873 (C.A. 1952); Prosser on Torts, §77. It has been termed "The best statement yet made" of the principles under which a possessor of land will be held liable to trespassing children for bodily harm caused by artificial conditions maintained thereon: Prosser on Torts, supra, at p. 620. There can be no doubt that §339 has been adopted in toto by this Court and is the law in this State; it has been cited, with approval, numerous times[3] by this Court. In *Bartleson et al. v. Glen Alden Coal Company et al.,* 361 Pa. 519, 529, 64 A. 2d 846, Mr. Justice LINN said for this Court: ". . . To the extent that past cases are in conflict with the view of section 339 of the *Restatement of the Law of Torts,* which we have adopted, they are no longer authority. . . .". The issue here is whether the evidence presented by the plaintiffs at the trial brings the case within §339. We think it does not.

---

[3] *Thompson et al. v. Reading Company,* 343 Pa. 585; *Prokop et ux. v. Becker et al.,* 345 Pa. 607; *Altenbach et ux. v. Lehigh Valley Railroad Company,* 349 Pa. 272; *Allen, Admr., v. Silverman,* 355 Pa. 471; *Malischewski et al. v. Pennsylvania Railroad Company et al.,* 356 Pa. 554; *Mussolino et ux. v. Coxe Bros. & Company, Inc.,* 357 Pa. 10; *Patterson et al. v. Palley Manufacturing Company (et al.),* 360 Pa. 259; *Bartleson et al. v. Glen Alden Coal Company et al.,* 361 Pa. 519; *Bruce et al., v. Pittsburgh Housing Authority,* 365 Pa. 571; *Gallagher v. Frederick,* 366 Pa. 450; *McGuire v. Carey,* 366 Pa. 627; *Verrichia v. Society Di M. S. Del Lazio,* 366 Pa. 629; *Jennings v. Glen Alden Coal Company,* 369 Pa. 532; *Rush v. Plains Township,* 371 Pa. 117; *Scibelli v. Pennsylvania Railroad Company,* 379 Pa. 282.

Section 339 provides: "A possessor of land is subject to liability for bodily harm to young children trespassing thereon caused by a structure or other artificial condition which he maintains upon the land, if (a) the place where the condition is maintained is one upon which the possessor knows or should know that such children are likely to trespass, and (b) the condition is one of which the possessor knows or should know and which he realizes or should realize as involving an unreasonable risk of death or serious bodily harm to such children, and (c) the children because of their youth do not discover the condition or realize the risk involved in intermeddling in it or in coming within the area made dangerous by it, and (d) the utility to the possessor of maintaining the condition is slight as compared to the risk to young children involved therein.". The Restatement thus lays down four requirements, all of which must be met before a possessor of land is liable for injuries to trespassing children: *Verrichia v. Society Di M. S. Del Lazio,* 366 Pa. 629, 79 A. 2d 237; *Jennings v. Glen Alden Coal Company,* 369 Pa. 532, 87 A. 2d 206.

There was evidence in the present case, sufficient perhaps,[4] to go to the jury, to meet the conditions of clauses (a), (b) and (c) of §339. But the evidence intended to satisfy the condition of clause (d) was not such as to make this element also a jury question.

The comment in §339 makes this explanation of clause (d): "In determining whether a particular condition maintained by a possessor upon land which he knows to be subject to the trespasses of children involves an unreasonable risk to them, the comparison

---

[4] Our consideration of the case has been made difficult because in his zeal plaintiffs' counsel in his brief has made misstatements of fact and unwarranted assumptions.

of the recognizable risk to the children, with the utility to the possessor of maintaining the condition, is of peculiar importance. The public interest in the possessor's free use of his land for his own purposes is of great importance. A particular condition is, therefore, regarded as not involving unreasonable risk to trespassing children unless it involves a grave risk to them which would be obviated *without any serious interference with the possessor's legitimate use of his land. . . ."*. (Emphasis supplied). In Prosser on Torts, supra, it is said at p. 624: "The utility to the possessor of maintaining the condition must be slight as compared with the risk to children involved. Here, as elsewhere, negligence is to be determined by weighing the probability and the gravity of the possible harm against the utility of the defendant's conduct. The public interest in the free use of land is such that, in general, he will not be required to take precautions which are so burdensome or expensive as to be unreasonable in the light of the risk, or to make his premises 'child-proof.' Such things as standing freight cars and moving vehicles are undeniably attractive to children, but are socially useful and very difficult to safeguard, and so may call for very little in the way of care. . . .".

This Court has consistently maintained a strict insistence on keeping the application of §339, Restatement, Torts, within proper bounds. In all of the cases where recovery has been allowed, we have stressed the necessity of proving that the danger could be eliminated at moderate cost and effort on the part of the defendant. In every one of these cases, the hazard which caused injury to the child was confined to a small fixed location and could have been eliminated with little effort. In *Thompson et al. v. Reading Company,* supra, where an 8-year old boy was injured on a rail-

road turntable, the accident could have been prevented by a simple locking device which was on the turntable but had been broken for a long time. We pointed out, at p. 600, that: "... The expense and attention required in so locking such instrumentalities are negligible. ...". In *Altenbach et ux. v. Lehigh Valley Railroad Company*, 349 Pa. 272, 37 A. 2d 429, we allowed recovery where a 3-year old boy drowned in defendant's small reservoir. The defendant had allowed its fence around the reservoir to become in a state of disrepair with several boards missing, and we held the defendant liable since the dangerous condition could be eliminated by a little attention and a slight outlay of money. Id. at p. 275. In *Allen, Admr., v. Silverman*, 355 Pa. 471, 50 A. 2d 275, where recovery was allowed when a 400-pound metal cylinder, which had been left standing unblocked, rolled off a sloping platform and killed a 5-year old child, we said at p. 475: "... It is obvious that for but a very slight cost blocks could have been securely fastened to the platform or the cylinder could have been stored in a place not dangerous to children ...". In *Patterson et al. v. Palley Manufacturing Company (et al.)*, 360 Pa. 259, 61 A. 2d 861, where a 13-year old boy was injured when the wall of a partially demolished building fell upon him, we held that the defendant could have placed a guard on the demolition site for the one additional night during which the wall was permitted to stand, or could have torn it down immediately rather than allowing it to stand until the next morning. The cost of such precautions in the course of a four-day demolition job was obviously inconsequential. In *Bartleson et al. v. Glen Alden Coal Company et al.*, supra, on which plaintiffs principally rely, we allowed recovery where an 11-year old boy climbed upon a stationary tower and came in contact

with a high tension wire. The tower was enclosed by a fence 7 feet high, the gate of which was unlocked, and we said at p. 527: ". . . The installation of a locking device, at negligible cost, would have obviated the risks to children. . . .".

Plaintiffs' counsel has not cited any case that goes as far as he would now have us go in requiring a possessor who is legitimately using his land for a socially desirable purpose, to take burdensome precautions so as to eliminate the risk of injury to trespassing children. He admits that the 67th Street bridge was properly constructed so that it was impossible to gain access to the electric wires running over the tracks from the street level of the bridge. It is also not contended that the uninsulated wires, necessary for the electrical operation of defendant's trains, could or should have been insulated. Plaintiffs maintain that the defendant was under a duty to fence in the right-of-way at the 67th Street bridge, or else to see that the electric company's fence was maintained in good condition. However, it is so well settled in this State as to admit of no argument, that it is not obligatory on the part of the railroad to fence its right-of-way to prevent trespassing by children: *Malischewski et al. v. Pennsylvania Railroad Company et al.*, 356 Pa. 554, 52 A. 2d 215; and cases cited therein. In addition it should be noted that on the north side of the tracks between 67th Street and 66th Street, practically the entire block gave easy access to the railroad and of course this would also have to be fenced to prevent children from playing in the area. Moreover the plaintiffs' evidence in the instant case amply shows not only that children played at the base of the 67th Street bridge, but also that they played in many other areas along this right-of-way. One of plaintiffs' witnesses, a Mr. Brower who

was a former locomotive engineer for the Pennsylvania Railroad, testified that he had often seen children playing beside the right-of-way and on the railroad cars all along his entire run which was from New York to Washington and return, and in the Philadelphia area he specifically mentioned 39th, 49th, 50th, 59th, 67th, 71st and 72nd Streets in Philadelphia.[5] Within a 30-mile radius of Philadelphia, the defendant has 275 miles of electrified main tracks. Although the plaintiffs are interested only in the railroad right-of-way at 67th Street, if the present argument should prevail, it would apply to any spot along the tracks at which children frequently played. What the plaintiffs are saying is that in any area along the railroad property which children frequent, the defendant must make it impossible to reach its tracks either by the erection of child-proof fences of its own or by making certain that the fences of others are sufficient and maintained in good condition. Clause (d) of §339 imposes liability where the owner of the premises, the other conditions being present, could eliminate the dangerous condition at no great expense and with little interference with the use of the land. It is, of course, obvious that if there were imposed upon the defendant the requirement of fencing the place where this accident occurred,

---

[5] To momentarily digress—in support of the requirements of clause (b) of §339, this witness also testified that defendant had issued special instructions for engineers to blow a whistle at 49th Street, 59th Street and 67th Street because of children playing around these areas. His testimony as to the issuance of such instructions was contradicted by plaintiffs' own witness, George Bottomly, a Rules Examiner of the railroad, and also by overwhelming testimony adduced by the defendant. For the same purpose, plaintiffs' counsel in an attempt to impeach his own witness (without any plea of surprise and over counsel's objection) referred to 4 prior electrical accidents occurring at 49th Street, 54th Street, 65th Street and between 66th and 67th Street.

it would likewise be subject to the duty of fencing the innumerable places along its many miles of tracks frequented by trespassing children, to prevent them from clambering over cars of a train halted in transit. The same is true of plaintiffs' claim that the defendant should patrol up and down the length of a train, temporarily halted at an unpredictable point, to protect against children who might happen to climb upon one of its cars. Railroad passenger and freight trains are frequently quite long and they would have to be manned by a score of employes simply to patrol the train while it was thus temporarily standing. Patently the ordinary train crew, aside from their duties in connection with the train's operation, could not effectively perform such function. It would be hopelessly impracticable to employ sufficient guards to police every car on a train which the safety of railroad operations required to be stopped in transit.

The protective measures suggested by the plaintiffs, if adopted, would inordinately burden the operation of the railroad, and consequently have been rejected by this Court in the past. In *Tiers v. Pennsylvania Railroad Co.*, 292 Pa. 522, 531, 141 A. 487, we said: ". . . If it were bound to keep constant guard against the possible presence of others, wherever it was customary for trespassers or licensees to enter upon its right of way, a proper operation of trains for the convenience of the public would be rendered most difficult, if not impracticable. . . .". In *Shaw v. Pennsylvania Railroad Company*, 374 Pa. 8, 96 A. 2d 923, where a 12-year old boy was injured while climbing over a flat car that was part of a standing train temporarily stopped across a permissive way, we held that there was no duty on the part of the railroad company to place lookouts at the permissive crossing to prevent children from climbing up-

on the cars. In *Scibelli v. Pennsylvania Railroad Company*, 379 Pa. 282, 108 A. 2d 348, a 7-year old boy was injured while attempting to board a freight train which stopped momentarily in an area of land frequented by children. In rejecting the plaintiffs' contention that the railroad should have posted guards to prevent children from boarding the train, we said at p. 289: "Needless to say, the operation of its trains by a railroad company over its right-of-way for the transportation of freight is an essential function. It is vital to commerce, and the public as well as the railroad company has an interest therein. The maintenance of service should not be made unduly burdensome. We have been referred to no case where a court has gone so far as to require a railroad company to patrol its tracks or police its trains with a sufficient number of guards to prevent children from attempting to board them. On the contrary, other jurisdictions have held that no such duty exists: See Smith v. Illinois Cent. R. Co., 214 Miss. 293, 313, 58 So. 2d 812, 819 (1952); Union Ry. Co. v. Williams, 6 Cir., 187 F. 2d 489, 493 (1951); Nolley v. Chicago, M., St. P. & P. R. Co., 8 Cir., 183 F. 2d 566, 569, 570 (1950); Angiline v. Norfolk & W. Ry. Co. et al., 99 W. Va. 85, 128 S.E. 275, 277 (1925); Wilson v. Atchison, T. & S. F. Ry. Co., 66 Kan. 183, 186, 71 P. 282 (1903); The Oregon Ry. and Nav. Co. v. Egley, 2 Wash. 409, 26 P. 973 (1891). It is difficult to conceive how a proper operation of trains for the service of the public could be maintained if the standard of responsibility contended for received countenance.". Referring to §339 (d), Restatement, Torts, we held at p. 920 that ". . . the impracticable and burdensome task of exercising police supervision over its trains would be out of proportion to the risk to minor trespassers involved. . .".

We are of the opinion that to allow recovery under §339(d) of the Restatement in the instant case would extend that rule far beyond its reasonable and intended limits. It would impose upon railroads a heavier burden than they can justly be expected to bear. Children, and especially those responsible for their parental protection, must be held accountable for their actions where such actions conflict with the dominant public interest in preserving to the possessor the legitimate and necessary use of his land: *Powell et al. v. Ligon et al.*, 334 Pa. 250, 255, 5 A. 2d 373; Eldredge, Tort Liability To Trespassers, 12 Temple Law Quarterly, 32, 50, Modern Tort Problems, 163, 192. However much we may sympathize with the minor plaintiff and his parents on account of the unfortunate injuries he sustained, we think the record fails to show negligence on the part of the railroad company or its employes.

The judgment is reversed and here entered for the defendant.

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

On the afternoon of January 10, 1953, a Saturday, a day which has always been one of play for children and is increasingly becoming so for adults, Daniel Dugan and his brother Harry, 11 and 8 years of age respectively, romped and played games in a patch of hedges and underbrush adjoining the tracks of the Pennsylvania Railroad near the abutment of an overhead bridge at 67th Street in Philadelphia. In this area boys had dug caves and tunnels and, in the spirit of imaginative adventure, which makes childhood an infinity of delight, they had named the place "The Jungle." Here they played the usual boyhood games of "hide-and-seek" and "cowboys," adding in the exhilaration of phantasy, another one which they called "explorers."

A concrete sluice, built to drain off water from the bridge abutment, and sloping down the embankment to the railroad tracks, served the young explorers as a toboggan slide which carried them to the very edge of the railroad right-of-way which was occupied by four tracks.

While the two Dugan boys reveled and made merry in the "Jungle", a long freight train of 61 cars came up and stopped on the second track. Several box cars with side ladders halted close to the foot of the sluice, down which the youthful adventurers cavorted in their carnival of fun. Five steps away from the end of this exciting journey the box cars, with their welcoming ladders, beckoned to fresh adventure. The boys had earlier decided that they would complete the afternoon's enjoyment by witnessing a film or two at a movie theatre on the other side of the tracks.

Clearing with eager stride the distance from the sluice to the bottom of the box car, Daniel clambered to the roof of the car and viewed the surrounding world at his feet. Only a few feet above his head a high tension electric catenary wire, which supplied current for electric locomotives, stretched its course. As his brother Harry prepared to follow up the ladder, Daniel called out, warning him that when he got to the top of the car, he was not to "fool around the wires." With this admonition Daniel pointed to the wire to make his point clear. Suddenly the jolting force of 11,000 volts arced through the atmosphere and struck Daniel, toppling him to the ground. Although no part of Daniel's body had actually come into contact with the wire, the burns inflicted were of such a character that he lost an arm and suffered other serious injuries. The parents, suing in the boy's name and in their own right, initiated a trespass action against the Pennsylvania

Railroad which resulted in a verdict of $40,000 for the boy, and $10,000 for them. The Railroad Company moved for judgment n.o.v., which was refused and this appeal followed.

The majority of this Court has reversed the verdicts and entered judgment in favor of the railroad company. I regard this action as unjustified by the evidence in the case, by the law which controls that evidence, and by Section 339 of the Restatement, Torts, which the Majority cites as authority but misinterprets.

The fact that children played in the "Jungle" and crossed the railroad tracks at that point was common knowledge in the community and well known to the railroad company. Carmen Castellano, who lived in the neighborhood, testified: "Q. Can you tell us, please, what you know about the habit or practice of children playing in the vicinity of that bridge, on the east side of the bridge, on the east side of 67th Street? A. All I can say after the time the children are out of school they are over there playing . . . Q. Is it something that just happens once in a while or is it something that happens regularly and frequently as long as it is clear weather and school is out? A. Any time children are out of school you can see them playing there. Q. Do they also play on the west side of the overhead bridge? A. Play on both, sir. Sometimes they take a shortcut over the Pennsylvania . . . Q. How often have you seen them down there? A. Many times. I have had to call the police several times, city police and *railroad police*. . . . Q. What do they do when they go down on there? A. Take a short cut, cross over, climb over cars, crawl over the bank."

Mrs. June Peck, who also lived in the vicinity, testified: "Q. How long have you lived there? A. Five years. Q. And in the course of the time that you have

lived there have you seen children playing around anywhere near the right-of-way or the railroad itself? A. Yes, I have. Q. And how often have you seen children down there playing? A. Almost every day. . . . Q. Have you seen children playing around on these cars? A. Yes, I have. Q. Have you seen them climbing over cars? A. I have, yes. Q. Have you chased children off these cars? A. Yes, I have."

Harry Dugan, the minor plaintiff's brother, testified: "Q. And have you seen children try to get across when the train was there? A. Yes. Q. How did they get over? A. They would go over, crawling under or over or either they would go over the top of them. Over the top of the train. Q. Over the top of the train itself? A. Yes. Q. How did they get up? A. There was a ladder there. Q. Have you seen them do that often? A. Yes sir."

Not only was the railroad police, as indicated in Castellano's testimony, aware of conditions on the railroad in the 67th Street area, but the company itself took official cognizance of the situation. Harry W. Brower, who had been an engineer for the company for 47 years testified that the railroad posted bulletins at the roundhouses instructing locomotive engineers that when they approached 49th, 59th, and 67th Streets they were to blow their engine whistles "hard," because of "so many children playing." He also testified that during the many years that he took his train by 67th Street he often saw children there: "Q. What did you see children do with respect to these trains standing there? A. I seen them crawl underneath. Q. Have you ever seen them go over top of them? A. Over the top sometimes, yes . . . Q. Can you tell us whether or not certain things happened during these years which led to the promulgation of these special instructions

that was a matter of known reputation around the railroad? A. Well I suppose on account of children getting hurt was the reason they put them out, as far as we thought. . . . Q. How many times have you seen children actually on cars in this 67th Street area? A. Oh, a lot of times. Q. Tell us when? A. Well whenever I would be on them freight jobs and would go down there in the summertime you can see them quite often. Every day. Q. Every day? A. If you were down there every day I mean. A. Every day that I was down there."

When a railroad for years allows children to use and occupy its tracks and immediate vicinity, it cannot treat them as trespassers and it must accord them a care which must be something more than token. This Court said in the case of *Gawronski v. McAdoo*, 266 Pa. 449, 454: "We have repeatedly held that, where a railroad company permits its yards or tracks to be used as a playground for children, the corporation is required to operate its rolling stock with due care to avoid injuring such children, and that the ordinary rule, as to the limited measure of duty owing to trespassers, *is* inapplicable . . . We have held likewise that one fixed with a duty to regard the safety of children is obliged *reasonably to anticipate they will do the ordinary and natural things* which may be looked for from them under the circumstances." *

What are the ordinary and natural things to be expected of children? The obvious answer is that they will act like children. The playful instincts of boys of tender age are as much a part of the demonstrated forces of nature as the snows of January, the winds of March, and the roses of June. To speak, in this after-

---

* Italics throughout, mine.

noon of the universe, of these elementary and fundamental concepts, which were already accepted fact in the dawn of creation, would be sheer superfluity. And yet it would seem that this truism can at times be overlooked by sages of the law who would attribute to infants the reflection of graybeards, while at the same time excusing the neglect of adults who act with the irresponsibility of children.

Justice OLIVER WENDELL HOLMES has spoken on this subject in his familiar epigrammatic style: ". . . while it is very plain that temptation is not invitation, it may be held that knowingly to establish and expose, unfenced, to children of an age when they follow a bait as mechanically as a fish, something that is certain to attract them, has the legal effect of an invitation to them although not to an adult." (*United Zinc Co. v. Britt,* 258 U.S. 268, 275).

In the *Gawronski* case, from which we have already quoted, an eight-year old boy had been standing on a freight car in a railroad yard which, for a long time, in conjunction with other contiguous railroad property, had been used as a playground when the car was struck by other cars which had been hit by a runaway engine. What we said there should be said here: ". . . it becomes clear the case was for the jury—to say whether or not the railroad acted with due care toward these little ones."

In the case of *O'Leary v. P. & L.E.R.R. Co.,* 248 Pa. 4, the lower Court entered a nonsuit where a child was killed by a railroad car passing through an area which for years had been used as a playground for children. In removing the nonsuit, this Court said: "The uncontroverted testimony in the case shows that this is a populous community where there are a great many children who have for many years used the ground ad-

jacent to the railroad tracks as a playground, and had the testimony which was offered been admitted, it would have appeared that the playground, used for so many years by the children, included the part of the defendant's ground where the child lost its life. . . In moving its trains on the tracks, the defendant, therefore, did so with the knowledge that the children of the neighborhood had been for many years using the ground as a playground, and was required to anticipate that they would continue to do so. This imposed upon the company the duty of reasonable care in the operation of its trains over the tracks so as to avoid injury to those who might be making a permissive use of them. If the jury found that the defendant failed to exercise such care in the operation of its trains on the day of the accident which resulted in the death of John O'Leary it would be negligence which would impose liability."

The defendant railroad company here not only owns the right-of-way with the four tracks, but it is the proprietor of the 67th Street Bridge, as well as the sluice and the embankment with the tunnels and caves. Thus, the situation in this case is not much different from that which obtained in the *O'Leary* case just cited.

The railroad company attempted at the trial to deny that its embankment had been used by children as a playground, but its effort in this direction was something less than a triumph. Called by the railroad company as a witness, the principal of the high school on 67th Street testified that he never saw children playing on the embankment or on the railroad tracks but in cross-examination he said that the windows of his office did not overlook the embankment or tracks, and thus he could not know what happened there.

A police officer Reid summoned by the defendant testified that he never saw children on the bank or on

the railroad track, but in cross-examination he admitted that because of his numerous duties which took him into areas far beyond the 67th Street Bridge he was not in a position to tell what happened there.

On the lot next to the high school the Philadelphia Electric Company maintains a high tension electric wire tower which is surrounded by a wire fence with a gate, punctured by a large hole. It was through this hole that the plaintiff passed in getting down to the embankment and the railroad tracks. The defendant thus sought to make of the plaintiff a trespasser, but Police Officer Boyle, called by the defendant, testified that the gate, with the hole, was open most of the time (9 out of 10 times he saw it), so that the minor plaintiff could have gotten to the railroad tracks without passing through the hole in the fence.

That the railroad company was aware that the train involved in the Dugan accident often stopped in the vicinity of the Jungle is acknowledged in the Majority Opinion, which relates that during the month preceding the accident, the train in question had been delayed at the Jungle for periods varying from 8 to 59 minutes. The railroad was thus charged with the knowledge that boys might climb over the halted cars as they had been doing for years in the past. Why did the railroad company not do something to prevent this dangerous practice? Daniel Dugan was not the first person injured by the catenary wires in this vicinity. Sergeant Elijah L. Hammond of the Railroad Police testified that he knew or was informed of three other cases of boys who had sustained serious injuries when, after climbing box cars, they had come into contact with the overhead electric line. This Court has often held that knowledge on the part of a defendant of a danger on his property, which has resulted in injury to others, is a relevant fac-

tor to be considered by the jury in determining whether the defendant has exercised due care under the circumstances. In *Muller v. Kirschbaum Co.*, 298 Pa. 560, the trial Court admitted the introduction of evidence to the effect that on three occasions within the preceding five years an accident similar to the one in litigation had occurred. This Court approved the ruling which permitted the evidence: "Knowledge of the likelihood of injury is imparted by information of like occurrences under similar circumstances, and is a fact to be considered by the jury in determining whether proper precautions were taken".

Is it unreasonable to say that the railroad should have foreseen that children might climb box cars which stopped at the Jungle? It knew that boys had been mounting box cars; it knew of the catenary wire. Was it too much to expect that in ascending to the top of the cars, boys might come within range of the deadly current overhead? If the railroad had placed ladders under the wires would it be an unwarranted assumption that eager and spirited boys would climb the ladders? In the case of *Bartleson v. Glen Alden Coal Co.*, 361 Pa. 519, a boy of the same age as Daniel Dugan (11 years plus) climbed a 45-foot tower for no other reason than the thrill of scaling the heights. At the height of 15 feet he was hit by the shock of a 4000-volt wire. In order to get to the tower young Ross Bartleson had to enter into a fenced enclosure 7 feet high, the gate of which had been left open. In the suit for damages against the owner of the land, the defendant argued that the dangerous wire was not on the ground and thus not within the foreseeable orbit of danger. This Court said, however: "There is no rule which requires that the dangerous condition must be on the ground or within reach of a minor. Such a distinction

is artificial, without logic or experience to support it. What this distinction really drives at is the question of whether or not a defendant shall be held reasonable to anticipate that a child will bring himself within the orbit of the danger. . . The act of climbing was not unusual, on previous days other boys had done precisely the same thing. The tower was equipped with pegs or studs intended to facilitate climbing. These pegs were accessible from the ground. It is strange that defendant would argue that he could not anticipate the use of these pegs for precisely the purpose for which they were put there."

If it was not unusual for Ross Bartleson to climb the pegs in the Glen Alden tower, with what less unusuality must we regard Daniel Dugan's climbing of the box car ladder? "That children will accept a situational invitation to climb is a matter of common knowledge . . . The jury found that plaintiff did not realize or at best imperfectly realized his exposure to danger. The tower was not so obviously dangerous that the child must be deemed to perceive the risk involved as though he were an adult." (*Bartleson,* supra, p. 529). If the soaring tower in the *Bartleson* case was not obviously dangerous to Ross Bartleson, certainly so substantial an object as a box car would be even less obviously dangerous to Daniel Dugan.

The Majority Opinion makes the sardonic remark that although Daniel Dugan had been described as a "very brilliant child" he had never heard of a live wire, and "knew nothing about the ability of electricity to arc from such a wire." In this connection it may be noted that even men working for the railroad are not familiar with all the phenomena which accompany the motive power of so vast an operation. Matthew A. Duffy, Inspector of Electric Transmission for the

Pennsylvania Railroad, testified that it was necessary for him to teach his own men about the "arcing" propensities of tension wires. But this case does not turn on whether Daniel Dugan knew or did not know about the arcing of live wires. The case would have been no different if he had touched the wire, as did young Ross in the *Bartleson* case.

The question in the *Bartleson* case, as it is the one in the case before us, was: What duty does the owner of land accommodating a dangerous device owe to minor trespassers? We answered that question in *Bartleson* by saying: "The defendant knew or should have known that children were likely to trespass upon its land. For years without objective disapproval children had played games within 20 to 400 feet of the tower; for years adults and children alike had used pathways carrying them past and within a few feet of the tower. In view of the overwhelming character of the testimony the jury could reasonably infer that the defendant coal company, through its agents, actually knew that children played in the vicinity of its tower. 'Toleration of trespass for sufficient time gives rise to privilege which adds to the duties of the occupier in the maintenance and use of his premises'."

In the case at bar the railroad knew that children played in the Jungle adjoining the tracks, knew that they played on the tracks, that they climbed box cars, that they crossed the tracks. Did the railroad take the precautions that the situation obviously demanded in order to avoid accident and tragedy? Did the railroad show toward Daniel Dugan the care to which, under the law of this Commonwealth, he was entitled? The jury answered those questions in the negative. Why does this Court negative the findings of the jury?

In the case of *Costanza v. Pittsburgh Coal Co.*, 276 Pa. 90, Francesco Costanza, 6 years of age, was killed

when he came into contact with an electric transformer located in an open lot frequently used as a playground by children of the neighborhood. Twenty feet from the enclosure containing the transformer stood an old wagon which was a source of attraction to children. The lower Court entered a nonsuit saying that since the deceased child had been a trespasser the defendant owed him no duty except to refrain from wilfully or wantonly inflicting injury. We reversed: ". . . in view of the use of the ground surrounding the enclosure as a playground, defendant was bound to recognize the fact that children in their play might heedlessly act in a way tending to result in personal injury and that childish curiosity in all probability might lead them to investigate the nature of the mechanism within the enclosure and under such circumstances there was imposed upon defendant the duty to anticipate and guard against such acts. It does not help defendant to say the main attraction on the lot was not the transformer but the old wagon standing near by. The latter was separated from the enclosure by a distance of but fifteen or twenty feet. If children played about the wagon it is but natural they would also, in the course of their play, pass around or into the small building and enclosure and probably climb upon, through or over the fence, whichever their fancy should dictate. Accordingly, it was defendant's duty, having knowledge that children were in the habit of playing in the vacant lot, and especially in view of the dangerous character of a high voltage electric current, to eliminate, as far as reasonably possible, all sources of danger."

Section 339 of the Restatement, Torts, provides that a possessor of land is liable for damages to an injured minor plaintiff if (1) he knows that children may tres-

pass on his land; (2) if he has on his land a dangerous instrumentality which may involve an unreasonable risk to children; (3) if children do not realize risk; and (4) if the utility to himself of "maintaining the condition is slight as compared to the risk to young children involved therein."

The Majority admits, rather begrudgingly I think, that the plaintiff has made out a case under the first three requirements of Section 339 but asserts he has failed under the fourth. The Majority says that the railroad company cannot be required to take precautions which are burdensome or so expensive as to be unreasonable. The evidence in the transcript of the record shows that the accident of which Daniel Dugan was the victim could have been avoided without the railroad company taking burdensome precautions or undergoing exorbitant expense. The freight train involved in the accident carried a crew of five men—engineer, fireman, head brakeman, conductor, and rear brakeman. During the 44-minutes delay on January 10, 1953, the crew had no duty to perform which would have precluded their overseeing conditions at 67th Street. They knew or should have known that children played there, they knew or should have known that children might mount the box car with their alluring ladders, and of course they knew of the high tension wires.

The railroad company maintains a police rail car with two-way radio equipment. When the tower operator in that area learned where the train was stopping, he had only to radio this information to the police car, and the 67th Street Bridge region would have been guarded. Sergeant Hammond testified that this was normal procedure: "Q. If the children are playing in any given vicinity and that is a fact that is known to

you, and a train stops in that vicinity, and you are informed that the train was stopped there, what would you do insofar as protecting that train and so far—A. If I was in that vicinity I naturally would try to get them off the cars. Q. And if the man at Brill either contacted you directly or contacted you whichever way he gets you, over that wireless, informed you that the train was stopped there in the vicinity where children were playing, what would you do insofar as protecting them? A. Proceed to that place to get them off any railroad property as fast as I could. Q. Would that be because you were afraid these children might climb on this car? A. Possibly would get on, yes sir."

However, this established procedure was not followed in the present instance. Was this not negligence? At any rate, was it not for the jury to decide whether or not the railroad's omission constituted negligence?

Clause (d) of Section 339 of the Restatement does not say what the Majority seeks to have the reader believe it says. I repeat the condition which fastens liability: ". . . the utility to the possessor of maintaining the condition is slight as compared to the risk to young children involved therein." What this clause obviously declares is that a possessor of land will be liable for injuries sustained by children trespassers if the usefulness of the dangerous device or operation is of little consequence as compared to the risk to which the children trespassers are subjected. The clause makes no mention of expense. Of course, the "condition," which is the subject of controversy here is not the movement of the train, which naturally is of great consequence. The "condition" is the stoppage of the train *without* taking measures to keep the children off it. Obviously the fact of not warning the children has no utilitarian

value to the railroad company at all. It isn't as if the train could not run if the children were not warned to stay off. The train could run with or without this being done. Thus the utility to the railroad is not only "slight", but practically non-existent.

From the question as to whether the "condition" is of slight or great importance has arisen the idea of slight or great expense. Thus, in the Comment on clause (d), a reference is made to dangerous farm machinery and then appears the comment: ". . . if the installation of devices which would prevent the machine being set in motion were practicable without burdensome cost or serious interference with the utility of the machine, it might be unreasonable for a farmer to keep a machine without such equipment in a place notoriously open to trespassing children."

It will be seen in this illustration that although the phrase "burdensome cost" is used, it is equated with "serious interference with the utility of the machine". In order for the landlord to be immune from responsibility, it must be shown that the elimination of the dangerous condition he maintains would seriously interfere with his business. But I repeat—keeping children off the box cars at 67th Street would in no way interfere (much less seriously interfere) with the operation of the railroad. Illustration 5 under Section 339 further emphasizes this point: "Under the circumstances stated in Illustration 4, the A Railroad Company would not be liable to B injured while playing upon its turntable, if a locking device capable of preventing children from setting the turntable in motion would have prevented its effective operation and if to surround it with a reasonably child-proof fence *would have seriously interfered with the operation of the railroad.*"

Without interfering in any way with the operation of the railroad the defendant could have built a fence

separating the Jungle from the railroad tracks. This would have assured keeping the children off the tracks and the expense involved would have been negligible.

The Majority, however, in discussing this phase of the case refuses to restrict the locus in quo to 67th Street where the accident occurred and where the Jungle was located, but speaks of fencing in vast distances and immeasurable areas over the 275 miles of electrified main tracks! There is no argument in logic so wearisome as that which seeks to prove a point by an irrelevant comparison or one so exaggerated in scope as to make it wholly foreign to the discussion. It is like equating an ant hill with Mt. Everest because they are both protuberances from the earth's surface, or comparing a flea with an eagle because they both fly, or a monkey with an elephant because they both eat peanuts. It is absurd to say that because the railroad would be required to fence away the Jungle from the tracks, it would be required to fence the whole length of its 275 miles of electrified main tracks or even to fence areas where a child or two has been seen playing beside the right-of-way or climbing on a car. Liability only arises where there is a known dangerous practice which a railroad company can avoid. Thus, it is no answer to say that if the railroad would be required to erect a fence some 20 or 30 feet long, at a cost of some one or two hundred dollars, it would be called upon to build a fence 275 miles long.

The Majority Opinion makes the statement: "However, it is so well settled in this State as to admit of no argument, that it is not obligatory on the part of the railroad to fence its right-of-way to prevent trespassing by children: Malischewski et al. v. Pennsylvania Railroad Company et al., 356 Pa. 554, 56 A. 2d 215; and cases cited therein." This matter may seem "well set-

tled" for the Majority, but the *Malischewski* case cited in support of the Majority's sweeping assertion does not support it at all. In that case, which had to do with a railroad station, and not a playground, Judge FIN-LETTER of the Philadelphia Court of Common Pleas, whose opinion was adopted by this Court, said: "With regard to the fencing of the right of way, it is established by the cases that it is not obligatory on the part of the railroad to fence its right of way." No one, with any appreciation of responsibility, has ever claimed that a railroad, especially a long one like the Pennsylvania Railroad, should be required to fence its *entire* right of way.

It occasionally happens that an attorney will cite in his brief a number of cases in alleged support of a given position, but which upon examination turn out not only not to uphold the asserted position but sometime actually are irrelevant to the point under discussion. The vexation which accompanies such a revelation is not lessened if the citer happens to be a Court instead of an attorney. The Majority Opinion has offered, in substantiation of its above-quoted statement, the *Malischewski* case "and cases cited therein." There are five cases cited. I have examined those cases and not one makes the assertion so categorically advanced by the Majority, namely, ". . . it is not obligatory on the part of the railroad to fence its right-of-way to prevent trespassing by children". One of the cases[1] makes no reference to a fence or fencing at all. Another of the cases[2] has nothing to do with a railroad right-of-way. The accident there occurred in a *pond of water* on land owned by a railroad company. In a third case,[3] the

---

[1] *Wright v. P. R. R.*, 314 Pa. 222.

[2] *Murdock v. P. R. R.*, 150 Pa. Superior Ct. 156.

[3] *Tedesco v. Reading*, 147 Pa. Superior Ct. 300.

plaintiff was injured when he tried to rescue a playmate who had fallen on a railroad track. The Court there said: "There was no duty upon defendant to fence and guard its tracks so as to prevent entrance by children," but the Court was referring, *not* to the whole length of the Reading Company tracks. It meant only the particular portion of tracks where the accident occurred. Following the quotation just given, the Court went on to say: "The tracks [where the accident occurred] were not easily accessible and afforded no facilities for play, and there was no proof that they were used in such a manner as to presuppose an invitation or permission to occupy them as a playground or permissive way." In the fourth case [4] it was established that a certain portion of a railroad was not a permissive passageway and therefore there was no obligation on the part of the railroad to fence *it* in. In the fifth case [5] the plaintiff was hurt when in searching for a lost baseball on the edge of a hill, the path beneath his feet (because of rain) caved in and he fell over an embankment down to railroad tracks beneath. The Court there said there was no obligation on the part of the railroad to "shore up the cut or to fence it in."

In not one of these cases, nor in any case that has come to my attention, has the statement ever been made or even distantly suggested that there could never be a situation where a railroad would be required to fence a *part* of its right-of-way to prevent injury to children. Indeed it would be monstrous for a Court to render such a decision. To say, for instance, that a railroad company, whose tracks went by a school for deaf or blind children, would not be required to fence its right-of-way at that point would be to make an utterance

---

[4] *Noonan v. Pa. Railroad Co.*, 128 Pa. Superior Ct. 497.

[5] *DiMarco v. Penna. R. R. Co.*, 321 Pa. 568.

that no Court in the land worthy of the name would countenance.

In further attempted support of its position that the railroad is under no obligation to take steps to prevent children from being injured or killed on its right-of-way, the Majority mentions *Scibelli v. Pennsylvania Railroad Company,* 379 Pa. 282. In citing this case the Majority apparently proceeds on the assumption that a decision badly made acquires virtue and authority with the passage of time and by subsequent citation. In the *Scibelli* case it was established that children had used the railroad right-of-way as a playground for eighteen years. On the day of the accident a train with a crew of five men stopped within the playground known as "The Willows." Not one of the crew descended from the train to warn children not to board the train although the crew knew, or should have known, that for eighteen years children had been doing this. The minor plaintiff, seven-year-old Frank Scibelli boarded one of the cars and when it jerked he was thrown under the wheels, losing a leg. It was the contention of the plaintiff that the accident would have been avoided if one of the crew or anyone representing the railroad had exercised supervisory protection around the train when it stopped within the playground. The Majority of this Court, using the same type of reasoning that it is employing in this case, said that there was no duty on the part of the railroad "to patrol its tracks or police its trains with a sufficient number of guards to prevent children from attempting to board them." Here again we have that sophistry in argument which make of a limited proposition an assertion of universal application. The playground in the *Scibelli* case was only one block long,—375 feet. But, in answering the plaintiff's position that the rail-

road should patrol the fragmentary distance of 375 feet for a matter of minutes, perhaps only seconds—when the train momentarily stopped in the playground—this Court answered that there was no obligation on the part of the railroad to patrol the whole length of the railroad and to have police guards on every train!

This is not the place for a reargument in the *Scibelli* case. I gave my views on the matter at the time the Majority Opinion was filed, but I would not want the mere citation of the Scibelli judgment to be interpreted (insofar as I can voice objection to it) as one worthy of being regarded as a precedent. I regard the injustice of the *Scibelli* decision as one of the dark pages in the history of the development of the rights of children and I believe that some day this Court will repudiate it. However, until that day comes I can only look upon it with a depressed spirit and an intellectual abhorrence.

In listing railroad cases where children were injured and recovery was allowed in the past, the Majority Opinion says: "In all of the cases where recovery has been allowed, we have stressed the necessity of proving that the danger could be eliminated at moderate cost and effort on the part of the defendant." While it happened in those cases, as indeed it would be true in this case, that the monetary expenditure required to remedy the dangerous situation was a small one, I cannot accept that where life and limb are endangered, money should be an obstacle to safety. Progress would be a melancholy phenomenon if it were to be made at the expense of the well-being of children. While it is important that railroads run, it is more important that they run to serve mankind. Of course, railroads cannot be mulcted in damages without law. No railroad could possibly exist if it were enough merely to

charge it with negligence in order to require it to disburse large sums of money. On the other hand, it cannot be successfully argued that because railroads supply an indispensable service to civilization's needs, they are immune from the laws of liability which govern every other type of commercial venture.

The argument that the railroad's exchequer takes precedence over the value of human life runs counter to everything that has been advocated and done in America in the way of social and economic progress. In every progressive step of the laws of safety, the protest of those who have opposed has often been the cost for the installation and maintenance of the innovation. But we have seen how safety and greater appreciation of the precious commodity of existence advances, notwithstanding. When a dangerous curve wrecks a train, railroad architects and civil engineers consider at once ways of straightening out the track so as to avoid future wrecks. When a hillside caves in, burying a train and its passengers beneath an avalanche of death and crippling injuries, the mountain is trussed up with bands of steel and fortified with masonry. When a flood washes a train into a swollen river the tracks are raised and future inundations balked. Tunnels are bored through mountain sides, interlocking systems are developed, bridges are thrown across chasms and ravines, all at huge expenditures of money, and all for safety, all for progress, and eventually for greater profit to the railroads too, because no railroad can hope to become successful if its tracks are strewn with the skeletons and limbs of victims of brutal indifference to humanity.

This observation is introduced not as a pronouncement of philosophy or a plea for humanity in the law. It has been made necessary because of the Majority's

assumption that clause (d) under Section 339 of the Restatement, Torts, absolves railroads from responsibility for negligence if it can be shown that it will cost them money to remedy a situation which sounds its own alarm calling for repair. The law of Pennsylvania proclaims in terse and clear terms the theme on which I have just expatiated, perhaps at too great a length. In the case of *Hawk v. P. R.R. Co.*, 307 Pa. 214, this Court, quoting from 20 R.C.L., page 25, sec. 18, said: "When human life is at stake, the rule of due care and diligence requires everything that give reasonable promise of its preservation to be done, regardless of difficulties or *expense*".

And we must not lose sight of the fact that while the defendant in this case is a railroad company, the dangerous instrumentality is not a railroad locomotive or train, but something far more devastating in its capacity for destruction—electricity. As this Court said in the case of *Sebok v. Pennsylvania Edison Co.*, 331 Pa. 524, 527: "It must be remembered that we are here dealing with one of the most dangerous agencies known to man—electricity."

In *Brillhart v. Edison Light & Power Co.*, 368 Pa. 307, 312, we said: "A supplier of electric current 'is bound not only to know the extent of the danger, but to use the *very highest degree of care practicable* to avoid injury to everyone who may be lawfully in proximity to its wires and liable to come accidentally or otherwise in contact with them' ".

Did the defendant in this case use the "highest degree of care practicable" in all the circumstances? That was the issue at the trial and it was decided by the jury in favor of the plaintiff. We have no warrant to disturb the verdict of the fact-triers, but since this Court has done that awesome thing, in defiance of principles

laid down by this very tribunal in happier decisions, I must, perforce,

Dissent.