## Malloy *v.* Pennsylvania Railroad Company, Appellant.

Argued September 28, 1956.   Before STERN, C. J.,
JONES, BELL, CHIDSEY, MUSMANNO and ARNOLD, JJ.

*Fred B. Trescher,* with him *Robert Garland* and
*Kunkle & Trescher,* for appellant.

*Robert W. Smith, Jr.,* with him *Smith, Best & Horn,*
for appellant.

*Joseph M. Loughran,* for appellee.

OPINION BY MR. JUSTICE BELL, December, 29, 1956:
The City of Jeannette and the Pennsylvania Railroad appealed from a judgment entered on a verdict against them jointly in favor of the plaintiffs. The important question involved is whether the evidence was

sufficient to establish a prima facie case of negligence against either or both of them and that such negligence was the proximate cause of the accident. The facts pertaining to the cause and the exact place of the accident are very meager. Viewed in the light of the testimony most favorable to plaintiffs and every reasonable inference arising therefrom, the facts are well stated in the opinion of the lower Court as follows:

"On September 11, 1952, the minor was found fatally injured at the foot of a railroad embankment in the City of Jeannette in this County. He was lying close to the foot of the embankment and a few feet away from the near rail of one of the four tracks of the railroad company. The right of way of the railroad company extends in a general easterly-westerly direction. South First Street in the City of Jeannette terminates at the southern side of the railroad cut at the point in question.

"The railroad cut at the point where South First Street meets the right of way of the railroad company is 57 feet in depth.

"On September 10, 1952, the minor, with his parents, had come to the City of Jeannette for a visit with certain of their relatives, and Michael T. Malloy, who was then ten years of age, on the afternoon of September 11, 1952, shortly after 5:30 p.m., left the home of his relatives with his cousin, Maureen Malloy, age sixteen, to play out doors. The two cousins, with several friends, rode bicycles up and down South First Street for some time before deciding to sit and talk in the church yard located approximately one block from the terminus of South First Street near the railroad property. Michael Malloy borrowed a bicycle from a boy named Bobby Hahn, one of the neighborhood children who was playing with him at the time. Maureen testi-

fied that Michael rode the bicycle on South First Street up to a barricade, turned around and back to the church yard at least five or six times.

"At the northern terminus of South First Street there is erected a wooden barricade extending in an east-west direction a distance of 18.84 feet. The barricade is formed of four upright posts and two plank cross pieces. The upright posts are 5 by 7 inches and the planks or cross pieces are 2 by 8 inches. These planks are nailed to the upright posts. The top of the westerly post is about 3.8 feet from the level of the ground; the next post in an easterly direction from there is 3.2 feet from the level of the ground; the third post from the western end of the barricade is 2.65 feet from the level of the ground, and the most easterly post is 3.15 feet in height.

"Maureen Malloy stated that she saw Michael go to the barricade on each occasion, with the exception of the last time he rode the bicycle north on South First Street, when she only saw him riding as far as Magee Avenue, which is located approximately 122 feet south of the barricade. After a period of three or four minutes had elapsed and Michael failed to return, Maureen, accompanied by her two companions, Bobby Hahn and Joel Martin, walked on South First Street to the barricade in search of the missing Michael. These young people found the bicycle Michael had been riding lying near the barricade. Maureen and her two friends walked around the north side of the barricade and looked down the railroad cut and saw Michael lying at the bottom of the cut, directly below the barricade. Maureen also testified that she noticed a mark about a foot or so in length extending down the embankment as she looked down and saw her cousin lying at the bottom of the cut.

"One Joseph Gurksnis, a resident of the City of Jeannette, testified that about 5:30 p.m. the day of the accident he was walking across the Second Street Bridge, which is located about one block west of South First Street. Mr. Gurknis testified that looking eastward from the bridge he could see the barricade at the end of South First Street; that he looked at it and as he looked, he saw an object * rolling or falling, stirring up a cloud of dust, down the embankment directly below the barricade located on South First Street. When he first saw the object, he located it as being 10 or 12 feet below the barricade rolling down the railroad embankment and that it fell down into the cut and landed right on a pathway down there near the tracks. The witness then ran across the bridge and saw that the object was a body of a boy lying at the foot of the embankment immediately below the barricade. He summoned help from a nearby store and walked up the cut with a police officer where they found the body of the minor, Michael T. Malloy, on the pathway between the foot of the embankment and the railroad tracks. He testified that the body was lying at a point directly below the barricade located on South First Street.

"A Miss Coletta McCartney testified that she lives in a house located at the corner of Magee Avenue and South First Street, which house extends in its length along South First Street. At the time of the accident, Miss McCartney was sitting on the porch of her home with her aged mother at the westerly side of the house. She testified that this section of South First Street, between the barricade and Magee Avenue, was used as a playground by children. She further testified that on the afternoon of this occurrence she noticed a number

---

* He was one block away and did not know what the object was.

of children riding bicycles on South First Street between the barricade and Magee Avenue. She saw Michael Malloy and noticed him particularly because he was the smallest of the children. She saw him riding back and forth from the barricade to Magee Avenue at least six or seven times. The last time she saw him, he was riding toward the barricade at the end of South First Street. She didn't see him again and she estimated that it was about five minutes from that time until she saw the other children running up the street screaming that someone had fallen down over the cliff.

"There is an abundance of testimony to the effect that the children from the neighborhood used South First Street between Magee Avenue and the railroad cut as a playground. They rode their bicycles, played ball and the usual childhood games.

"Both of the defendants deny erecting the barricade and each defendant contends that the barricade is not on its property.

"The jury returned a verdict in favor of the plaintiffs and against both defendants."

No one saw or knows how the tragic accident happened. It is important to note that there was no evidence that the barricade was broken or defective or inadequate; nor was there any proof that the present barrier should have been extended or that a barrier should have been erected at any other spot. It is apparently necessary to restate the principles of law which are applicable to the facts in the instant case.

In *Finnin v. Neubert,* 378 Pa. 40, 105 A. 2d 77, the Court said (page 43) : "Deep sympathy for this boy does not justify a Court's finding negligence unless the evidence justifies it. We said in Brusis v. Henkels, 376 Pa. 226, 102 A. 2d 146, ' ". . . 'The mere happening of an accident is no evidence of negligence . . . *Plaintiff*

*has the two-fold burden of proving that the defendant was negligent and that his negligence was the proximate cause of the accident:'* \* . . .":* Lanni v. P. R.R. Co., 371 Pa. 106, 109, 88 A. 2d 887. . . .'

. . .

". . . [In] Ebersole v. Beistline, 368 Pa. 12, 82 A. 2d 11, . . . The Court said (pp. 16, 17, 18) : 'The evidence is insufficient to warrant recovery if it fails to describe, picture or visualize what actually happened sufficiently to enable the fact-finding tribunal reasonably to conclude that the defendant was guilty of negligence and his negligence was the proximate cause of the accident.\*\* A verdict cannot be supported on the basis of mere speculation or conjecture. Proof of negligence may be furnished by the circumstances themselves and it is not essential to have eye-witness testimony, but where the circumstantial evidence is offered because direct proof is not available *it must provide as the only reasonable inference* the conclusion that the accident was caused by the negligence of the defendant. . . .

". . . There was no proof of absence or want of due care on the part of the defendant and conjecture, speculation, guess or suspicion do not amount to proof. The circumstantial evidence does not provide as the only reasonable inference the conclusion that the accident was caused by the negligence of the defendant; . . ."

In the instant case Michael could have intentionally left the street and walked around the barrier through wooded property to the spot from which he fell; he could have walked through the nearby properties and returned to a spot from which he fell; he could have been standing on the edge of the gorge or embankment

---

\* Italics throughout, ours.

\*\* This principle was reiterated as recently as *Gayne v. Carey Mfg. Co.*, 385 Pa. 618, 621, 123 A. 2d 432.

and slipped or fallen, or deliberately attempted to climb down the embankment and then have slipped and fallen. There was no evidence to prove or to justify a finding that Michael was thrown from his bicycle over the barricade and down the embankment. There was no proof that the railroad company or the City erected the barricade. Moreover, as the Court said in the recent case of *Dugan v. P. R. R.*, 387 Pa. 25, 127 A. 2d 343, where we restated the general rule: ". . . it is so well settled in this State as to admit of no argument, that it is not obligatory on the part of the railroad to fence its right-of-way to prevent trespassing by children:* Malischewski v. P. R. R., 356 Pa. 554, 52 A. 2d 215, and cases cited therein."

*McHugh v. Reading Co.*, 346 Pa. 266, 30 A. 2d 122, is a case which is analogous in its facts to the instant case and governs it. The case is well summarized in the syllabus which reads as follows:

"In an action for wrongful death, in which it appeared that the decedent, a six-year-old child, climbed on top of defendant's stone wall, seated herself on an ornamental scroll formation known to children in the neighborhood as 'the king's throne', and thereafter, while descending, fell some twenty-four feet to the street below and was killed, it was Held, under all the evidence, that the defendant was not liable.

---

* A property owner is not liable to a ten year old very alert, intelligent and exceptionally athletic boy for a steep embankment or dangerous condition, the existence of which is obvious and the risk of falling is fully realizable by him: *McHugh v. Reading Co.*, 346 Pa. 266, 30 A. 2d 122; *Prokop v. Becker*, 345 Pa. 607, 29 A. 2d 23. See also: *Roche v. P. R. R.*, 169 Pa. Superior Ct. 48, 82 A. 2d 332; *Jennings v. Glen Alden Coal Co.*, 369 Pa. 532, 87 A. 2d 206; *DiMarco v. P. R. R. Co.*, 321 Pa. 568, 183 A. 780; *Kosson v. West Penn Power Co.*, 293 Pa. 131, 141 A. 734.

"The duty of a possessor of land to trespassing young children, to keep the land free from artificial conditions which involve an unreasonable risk of death or serious bodily harm to them, does not extend to a condition involving a risk the full extent of which such children are likely to realize and understand."

Mr. Justice, now Chief Justice, STERN said (pages 268-269):

"We have not been referred by counsel to any Pennsylvania case, nor has our own research disclosed any, in which recovery was allowed against the possessor of land, even though a permissive playground, where a child was injured merely by falling or jumping from a stationary object or structure on the property. Liability to trespassing children has uniformly been limited to accidents arising from latent dangers, such as unguarded machinery, live wires, pits or open trap doors. This distinction results from one of the conditions of liability set forth in the Restatement of Torts, §339, clause (c), that 'the children because of their youth do not . . . realize the risk involved . . .' In the comment (p. 925) on this clause the Restatement says: 'A possessor of land is . . . under a duty to keep so much of his land as he knows to be subject to the trespasses of young children free from artificial conditions which involve an unreasonable risk of death or serious bodily harm to them. This does not require him to keep his land free from conditions which even young children are likely to observe and the full extent of the risk involved in which they are likely to realize. The purpose of the duty is to protect children from dangers which they are unlikely to appreciate and not to protect them against harm resulting from their own immature recklessness in the case of known danger.' This principle has been applied in our own cases, as, for ex-

ample, Oil City and Petroleum Bridge Co. v. Jackson, 114 Pa. 321, 6 A. 128; Rodgers v. Lees, 140 Pa. 475, 21 A. 399; Brown v. Scranton, 313 Pa. 230, 169 A. 435; Dolena v. Pittsburgh Terminal Coal Co., 324 Pa. 228, 188 A. 112; see also Krystopowicz v. Reading Co., 40 D. & C. 304.

"No danger is more commonly realized or risk appreciated, even by children, than that of falling; consciousness of the force of gravity results almost from animal instinct. Certainly a normal child nearly seven years of age—indeed any child old enough to be allowed at large—knows that if it steps or slips from a tree, a fence, or other elevated structure, it will fall to the ground and be hurt. It may be that some children, while realizing the danger, will disregard it out of a spirit of bravado, or because, to use the language of the Restatement, of their 'immature recklessness', but the possessor of land is not to be visited with responsibility for accidents due to this trait of children of the more venturesome type."

See to the same effect: *Prokop v. Becker,* 345 Pa. 607, 29 A. 2d 23; *DiMarco v. P. R. R. Co.,* 321 Pa. 568, 183 A. 780; *Jennings v. Glen Alden Coal Co.,* 369 Pa. 532, 87 A. 2d 206.

Appellees rely on *Balla v. Sladek,* 381 Pa. 85, 112 A. 2d 156, where defendant had failed to provide a barricade at a bend in a precipitous hillside. The Court said: " 'If a public street is dangerous by reason of its proximity to an embankment or precipitous decline, the city is liable for its failure by the erection of barriers or other devices to guard travelers from injury, in the use of the highway, who exercise reasonable care for their own safety' . . . ." The facts in the instant case do not bring it within the principle of *Balla-Sladek.*

Appellees also rely on Sections 368 and 369, Restatement of the Law of Torts. Neither section is applicable to the facts in the instant case. Even if it could be assumed that either or both defendants were negligent, plaintiffs failed to prove that such negligence was the proximate cause of the boy's death.

Judgment is reversed and is here entered for each defendant non obstante veredicto.

———

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

South First Street in the City of Jeannette which travels northwardly and southwardly, ends its northern terminus with a precipitate drop of 57 feet to the tracks of the Pennsylvania Railroad below. At this cliff-like extremity, the City of Jeannette or the Pennsylvania Railroad planted 4 upright wooden posts from 2.6 feet to 3.15 high, to which were nailed two cross planks with an overall width of 18.84 feet. A ledge of 2 or 3 feet separated the barrier from the sheer descent of 57 feet to the railroad road of way. Between this obstruction and Magee Street, one block away, the children of the neighborhood used South First Street as a playground, riding bicycles and playing baseball and other childhood games within the circumscribed area.

On the afternoon of September 11, 1952, Michael Malloy, a lad 10 years of age, with other children, revelled in the games and entertainment which the playground afforded. After several hours of play they all paused to rest and regale each other with stories, as they sat in a churchyard close by. But while the other boys were talking, Michael borrowed the bicycle of his friend Bobbie Hahn and rode to the barrier and back. He did this 5 or 6 times and then disappeared. Several

minutes later, the boy's friends set out to investigate the reason for his non-return, and, arrived at the end of South First Street, they looked over the edge of the rocky bluff and saw the body of their companion mutely lying at the foot of the precipice. Scurrying to the bottom of the embankment they found Michael Malloy dead.

Actions of trespass were brought against the City of Jeannette and the Pennsylvania Railroad and verdicts totaling $15,000 were returned in favor of the parents and the estate of the deceased boy. This Court has reversed those verdicts and entered judgment in favor of the defendants.

Both defendants were aware that the area in question was used as a playground for children; both knew of the proximity of the hazardous drop to the railroad tracks; both knew that the slightest slip on the part of any child at the edge of the hazardous plateau would cast him to his death to the railroad tracks in the abyss. Despite this knowledge, nothing was done by the defendants to protect the children from a fate which could so easily be foreseen. No signs were erected warning children to stay away from the cliff, and the barrier itself was as impotent to prevent anyone from toppling over the elevation as a scaffolding of toothpicks. The right of way of South Front Street was 50 feet in width, the so-called barrier was only some 18 feet wide.

The Majority Opinion hypothesizes as to how the accident occurred: "In the instant case Michael could have intentionally left the street and walked around the barrier through wooded property to the spot from which he fell; he could have walked through the nearby properties and returned to a spot from which he fell; he could have been standing on the edge of the gorge

or embankment and slipped or fallen, or deliberately attempted to climb down the embankment and then have slipped and fallen."

. After stating these imaginative situations, the Majority Opinion says: "There was no evidence to prove or to justify a finding that Michael was thrown from his bicycle over the barricade and down the embankment." But it was not necessary to prove that Michael was thrown from his bicycle over the barricade and down the embankment. It was enough to show that the defendants were negligent in allowing on their property a highly dangerous condition with the knowledge that children could be injured or killed by that condition, and yet do nothing to forestall that terrible possibility. That Michael fell over the embankment cannot possibly be questioned. Joseph Gurksnis testified to seeing his helpless form dropping to the tragic climax. The Majority Opinion ununderstandingly seems to want to envelop this incident in the fog of doubt and accordingly says of the testimony of Gurksnis: "He was one block away and did not know what the object was." But Gurksnis indubitably identified the object he saw falling as Michael: "Q. Were you the first to discover the boy, sir? A. I was the first to see him fall. Q. What did you do when you saw the boy fall? A. I crossed the street and I looked up into the cut to see what happened."

In justifying its exculpation of the railroad company from any liability in this case, the Majority Opinion cites the case of *Dugan v. P. R. R.*, 387 Pa. 25, and quotes from it as follows: ". . . it is so well settled in this State as to admit of no argument, that it is not obligatory on the part of the railroad to fence its right-of-way to prevent trespassing by children". Although I presented an argument several pages long in my Dis-

senting Opinion in that case showing that the quoted statement is not supportable in law or in fact, this Court goes on saying that the proposition it announces is so well settled "as to admit of no argument." How long must an argument be before it becomes an argument? The Majority may refuse to admit of the existence of the argument but the simple fact remains, as I demonstrated in the *Dugan* case, that this Court *never* laid down the doctrine that there can be no situation where a railroad would be required to fence its right of way to prevent children from trespassing on its property. To insist that there is no set of facts where a railroad should fence its right of way to prevent death and mangling injury to children is to declare what is not only opposed to every rule of humanity and justice, but it is to say what this Court never proclaimed even in the days when, correctly or incorrectly, the idea was current that the logic of railroad lawyers rarely failed to convince the Court of the correctness of their position.

The plaintiffs, in supporting their verdict won in the Court below, cited the case of *Balla v. Sladek,* 381 Pa. 85, decided only a year and a half ago. The Majority Opinion categorically announces that "the facts in the instant case do not bring it within the principle of *Balla-Sladek.*" If the facts in the instant case do not come within the principle of *Balla-Sladek,* it is only because they are stronger for liability against the defendants. In the *Balla-Sladek* case, a Linden. Avenue in East Pittsburgh, on which the fated vehicle was travelling, was 30 feet wide, accommodating two sets of trolley tracks and a lane for motor vehicles. On the other side of this lane rose a 6-inch curb and then beyond that extended a 6-foot sidewalk. A line of railroad ties, 6 or 7 inches high and 9 inches wide, bordered

the sidewalk. On the other side of the ties was a level portion of ground 4 feet in width and then came the embankment. The motor vehicle in which the decedent was riding left the street, climbed the curb, crossed the sidewalk, climbed the railroad ties, traversed the 4-foot wide berm and then went over the hillside. We held: ". . . whether the borough was negligent in not providing barricades at the hillside edge was a question properly left to the jury. 'If a public street is dangerous by reason of its proximity to an embankment or precipitous decline, the city is liable for its failure by the erection of barriers or other devices to guard travelers from injury, in the use of the highway, who exercise reasonable care for their own safety.' "

In the *Balla-Sladek* case, the hillside ran alongside the highway, here it is practically *in* the highway. Here we have a condition where a street suddenly terminates at the top of a precipice. As we already stated, no signs warned the wayfarer of the fatal embankment, and the barrier itself was not wide enough, strong enough, or tall enough to prevent anyone from slipping over the lip of the calamitous crag.

It is because of situations exactly as the one which appears in this case that the Restatement, Torts, Section 368, says: "A possessor of land who *creates or maintains thereon an excavation* or other artificial condition *so near an existing highway* that he realizes or should realize that it involves an unreasonable risk to others accidentally brought into contact therewith while traveling with reasonable care upon the highway, *is subject to liability for bodily harm thereby caused to them.*"*

It is because of death leaps like the one which overshadows the end of South Front Street in Jeannette,

---

* Italics throughout, mine.

that Section 369 of the Restatement provides: "A possessor of land abutting upon a public highway is subject to liability for bodily harm caused to young children by an *excavation* or other artificial condition maintained by him thereon so close to the highway that it involves an unreasonable risk to such children because of their tendency to deviate from the highway."

When the Pennsylvania Railroad sliced away the extremity of South Front Street and left the amputated remainder projecting out into empty air, it incurred the responsibility of bandaging up what was left in such a way that grownups and children using it would not drive or cycle out into the void. The earth is the foundation of every man-made superstructure, and no one has the right to remove part of that foundation without replacing it with safeguards which will save mankind from the inevitable law of gravitation which, unless checked, will take anyone within its grasp down to the deepest depths of which it is capable.

Despite the quotation by the majority of this Court in the *Dugan* case, and the repetition by the Majority in this case, of a quotation which presumes to perpetuate a doctrine which this Court has never proclaimed, a duty still devolves upon a railroad company to erect a stone wall, a fence, or any other type of suitable barrier to prevent human beings from tumbling into excavations, holes, and abysses which the railroad has created and which are screened from the general eye of caution and normal observation.

In refusing to enter judgment n.o.v., and in affirming the jury verdicts in the Court below, the Court of Westmoreland County, cited the precedent of *Rasmus v. Pennsylvania Railroad,* 164 Pa. Superior Ct. 635, as controlling the principles involved in the case at bar. The Majority Opinion makes no mention of the

*Rasmus* case. I believe, with the able and learned Westmoreland County Court, that *Rasmus* is controlling. In that case, the plaintiff, a boy 13 years of age, was walking along Railroad Street in Nanticoke when he slipped, lost his footing and was precipitated headlong down an embankment and over a stone wall to the roadbed of the railroad below. The plaintiff sued both the railroad company and the municipality of Nanticoke. There, as here, both defendants argued that neither was liable and that the plaintiff had failed to prove a case of negligence. In affirming verdict for the plaintiff, the Superior Court said: "As to the railroad the rule is well settled, and of general application, that a property owner who makes an excavation on his premises so near to an existing highway as to render the use of the road unsafe, will be liable to a traveler who, exercising due care for his safety, nevertheless falls into it and is injured . . . The City of Nanticoke similarly owed this minor a positive duty under the circumstances. If a public street is dangerous by reason of its proximity to an embankment or precipitous decline, the city is liable for its failure by the erection of barriers or other devices to guard travelers from injury, in the use of the highway, who exercise reasonable care for their own safety . . . Whether the city and the railroad were chargeable with negligence in failing to protect this minor-plaintiff from injury under the circumstances and whether their negligence concurred in causing the injury, were questions wholly for the jury."

The object of the civil courts is to impose pecuniary and property liability on those who are at fault and to absolve those who are without fault. In this process it is obviously unjust to require anyone to respond monetarily to a situation of which he had no notice

and had no way of anticipating. Did the City of Jeannette and the Pennsylvania Railroad have reason to believe that the unsealed-off end of South Front Street could carry a child to his death? This was not a situation which had newly arisen. For years now the City of Jeannette and the Pennsylvania Railroad knew that the block between Magee Street and the cliff had been used as a playground. There were no other playgrounds in the vicinity. A schoolhouse in the neighborhood released boys and girls for relaxation and play. The telltale block on the plateau became the scene of their happy cavortings while 57 feet below the dragon of death awaited the moment when its prey would unwaringly break through the guard of the feeble wooden sentinel above. Did the City of Jeannette and the Pennsylvania Railroad exercise the care required under the circumstances? Did they fulfill their duty which everyone owes to children who, because of their known impetuosity and their love of action and adventure are known to venture into the most hazardous of situations unless restrained by physical barriers which they cannot overcome? Only a jury could decide whether the municipality and the railroad company here involved discharged their obligations toward the children of South Front Street in Jeannette. The jury has decided that question. It reached a result which is equitable, fair, just, and proper. Why should it be disturbed?

I dissent.