Louis COUSINS, a minor by his parent and natural guardian, Louise Evans, and Louise Evans, in her own right

v.

Eugene YAEGER

v.

PENN CENTRAL TRANSPORTA-
TION COMPANY et al.

Civ. A. No. 72-1376.

United States District Court,
E. D. Pennsylvania.

April 25, 1975.

Raymond D. Rubens, Philadelphia, Pa., for plaintiff.

Joseph X. Heincer, Philadelphia, Pa., for Yaeger.

Robert R. Artz, Philadelphia, Pa., for Penn Central.

James J. Boyle, Philadelphia, Pa., for City of Philadelphia.

John J. Coffey, Philadelphia, Pa., for Patterson and Patterson Lumber Co.

George D. Sheehan, Philadelphia, Pa., for Yellin and Klein, Trustees and Klein and Schiller, Substitute Trustees.

Joseph R. Thompson, Philadelphia, Pa., for Air Reduction Co., Inc.

## MEMORANDUM AND ORDER

BRODERICK, District Judge.

This matter comes before the Court on the defendant's motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. This motion for summary judgment is submitted upon the pleadings, depositions, affidavits, exhibits and answers to interrogatories. For the reasons expressed hereinafter, the defendant's motion for summary judgment is granted.

The minor plaintiff, Louis Cousins, by his parent and natural guardian, Louise Evans, and Louise Evans, in her own right, have initiated this diversity action for injuries sustained by the minor plaintiff who was struck by a train operated by the Pennsylvania Railroad Company (now Penn Central) on August 6, 1970. The defendant, Eugene F. Yaeger, a citizen of New Jersey, is the owner of a parcel of land which abuts the railroad's right-of-way in the vicinity of the place where the minor plaintiff was struck by a train. Sometime prior to the filing of the complaint in this case, minor plaintiff and his mother instituted an action which is pending in the Court of Common Pleas of Philadelphia County against Penn Central and the City of Philadelphia in connection with the same accident. Two other non-diverse parties who also own land abutting the railroad right-of-way in the vicinity of the accident have been brought into this action together with the Penn Central and the City of Philadelphia as third-party defendants. The gravamen of the plaintiffs' cause of action against the defendant is stated in paragraphs 3 and 4 of plaintiffs' complaint as follows:

3. On or about August 6, 1970, at approximately 8:30 a. m., minor plaintiff, while playing in a field near 47th and Upland Streets, Philadelphia, Pa., owned by defendant was struck by a Pennsylvania Railroad train, resulting in serious personal injuries and other damages hereinafter set forth.

4. At said time and place, defendant, Eugene F. Yaeger, as owner of the property involved negligently caused the said minor plaintiff to be struck by the aforesaid train and said negligence consisted of the following:

(a) Failure to properly fence, guard and protect the public from access to the dangerous condition that existed about defendant's property;

(b) Failure to alert minor plaintiff of the danger of passing trains or to otherwise warn him of their existence;

(c) Allowing an attractive nuisance at the place of the accident with full knowledge that children play in the area;

(d) Allowing and failing to protect against access to the property at the place of the accident with full knowledge that the area had been used for many years by pedestrians as a cross-walk to cross the railroad tracks;

(e) Failure to erect and maintain proper and adequate signs, both to the general public and to the operators of the railroad's trains, of the dangerous condition;

(f) Knowledge and tolerance of constant intrusion upon land and access across railroad tracks and failure to safeguard against same;

(g) Knowledge of and reason to believe that his property was being used as a playground by children and failure to exercise ordinary care for their safety;

(h) Failure to properly identify and safeguard property owned by defendant, separate and apart from the railroad right-of-way;

(i) Being otherwise negligent under the circumstances.

The defendant contends that he is entitled to summary judgment on the following grounds: First, that the plaintiffs have not and cannot produce evidence of negligence on the part of the defendant because there is no evidence, either direct or circumstantial, as to which parcel of land the minor plaintiff crossed to reach the spot on the tracks where he was struck by the train; second, assuming arguendo, that the minor plaintiff crossed defendant's property to arrive at the scene of the accident, there is no duty upon the defendant as a landowner to erect a fence or other device to deter, or to warn, trespassing children from entering the right-of-way of the railroad. In support of his position, the defendant has submitted exhibits, the contents of which are uncontradicted, showing the size and location of the various parcels of land abutting the railroad right-of-way in the vicinity of the accident including the defendant's land and the land owned by the third-party defendants. (See Exhibits I, J, K.) In addition, defendant has submitted various depositions including those of the minor plaintiff and his mother.

The plaintiffs contend that there is a genuine issue as to questions of material fact and that the defendant is not entitled to judgment as a matter of law without plaintiffs having the opportunity to present evidence. Although given the opportunity to do so, the plaintiffs have not submitted affidavits or other evidence to support their allegations that the minor plaintiff crossed or made any use of the defendant's land in reaching the railroad tracks.

■■ The primary purpose of a motion for summary judgment under Rule 56 is to avoid a useless trial. 6 Moore's Federal Practice ¶ 56.02[10]. Functionally, the theory underlying a motion for summary judgment is essentially the same as a motion for directed verdict. The crux of both motions is that there is no genuine issue of material fact to be determined by the trier of the facts, and that on the law applicable to the evidence presented, the movant is entitled to judgment.

■ It is elementary that the plaintiff in an action such as this has the burden of proof to establish that the defendant was negligent and that such negligence was the proximate cause of the accident. It is also elementary that the party moving for summary judgment has the burden of demonstrating that no genuine issue as to any material fact exists, and that he is entitled to judgment as a matter of law. As stated in Moore's Federal Practice ¶ 56.15[3] at 2335–36:

The courts are in entire agreement that the moving party for summary judgment has the burden of showing the absence of any genuine issue as to all the material facts, which, under applicable principles of substantive law, entitle him to judgment as a matter of law.

The courts hold the movant to a strict standard. To satisfy his burden the movant must make a showing that is quite clear what the truth is, and that excludes any real doubt as to the existence of any genuine issue of material fact. (Footnotes omitted.)

Before summary judgment will be granted it must be clear what the truth is and any doubt as to the existence of a material fact will be resolved against the movant. Because the burden is on the movant, the evidence presented to the court is construed in favor of the party opposing the motion and he is given the benefit of all favorable inferences. However, if the moving party by affidavit or otherwise presents evidence which

would require a directed verdict in his favor at trial, then he is entitled to summary judgment unless the opposing party either shows by affidavit or otherwise that there is a triable issue of material fact. 6 Moore's Federal Practice ¶ 56.11[3]. Where a defendant presents evidence on which he would be entitled to a directed verdict, the burden is on the plaintiff, in opposing defendant's motion for summary judgment, to point out any evidence which might change the result. Rule 56(e) of the Federal Rules of Civil Procedure makes it clear that "When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him."

██ This Court is mindful of the hesitancy by trial courts to render summary judgment in negligence actions; however, we are equally cognizant of the propriety of summary judgment in a negligence action where there is no genuine issue as to any material fact. See 6 Moore's Federal Practice ¶ 56.15 [1.–0], 56.17[42], and cases cited therein. Summary judgment has been granted in numerous cases where the plaintiff has failed to show evidence of negligence on the part of the defendant. Algar v. Yellow Cab Co. of D. C., Inc., 103 U.S.App.D.C. 129, 255 F.2d 538 (1958); Wilkinson v. Powell, 149 F.2d 335 (5th Cir. 1945); Foecker v. Allis-Chalmers, 366 F.Supp. 1352 (E.D.Pa.1973); Miller v. Perry, 308 F.Supp. 863 (D.S.C.1970); McBride v. Procter & Gamble Mfg. Co., 300 F.Supp. 1150 (E.D.Tenn.1969); Clark v. Employers Mutuals of Wausau, 297 F.Supp. 286 (E.D.Pa.1969); Amick v. Gooding Amusement Co., 248 F.Supp. 782 (D.S.C.1966); Richardson v. Kubota, 234 F.Supp. 856 (N.D.W.Va.1964). This Court has considered the pleadings, the affidavits, the exhibits and the depositions which are before it in a light most favorable to the plaintiffs and concludes, for the reasons hereinafter set forth, that there is no genuine issue of material fact as to defendant's negligence to be resolved by the trier of fact, and upon the facts presented the defendant is entitled to a judgment as a matter of law.

With the appropriate legal standards in mind, the facts relevant to the determination of the motion now before the Court will be summarized: On August 6, 1970, the minor plaintiff, then 8½ years old was struck by a Pennsylvania commuter train while on the right-of-way of the railroad. At the time of the accident, the minor plaintiff and his 12 year old cousin Darryl, were enroute to an area adjacent to the Woodland Avenue bridge for the purpose of catching frogs. As shown on Exhibit "K", a copy of which is attached hereto, the Woodland Avenue bridge is an overpass located between 47th and 48th Streets on Woodland Avenue, under which passes the Penn Central tracks. The minor plaintiff was struck by the train a few feet from the bridge, which bridge is about 350 feet from the nearest edge of the defendant's property. The minor plaintiff at the time of the accident was living on the 4700 block of Upland Street, which is located between 47th and 48th Streets and Kingsessing and Woodland Avenues. The railroad right-of-way passes under the Woodland Avenue bridge and is separated from Upland Street by several intervening parcels of land. The defendant's property is located at the dead end of the 4700 block of Upland Street and a portion of the defendant's land adjoins the railroad right-of-way. This property, which has been owned by the defendant from a time prior to the accident, was formerly the Swainsboro Lumber Yard. Approximately one year prior to the date of the accident a fire occurred at the lumber yard and destroyed all the structures on the property. At the time of the accident, the former lumber yard was an open field without struc-

tures or fences. Prior to the fire the property was enclosed by wooden and cyclone fences with entrance gates at the dead end of Upland Street. Louise Evans testified that prior to the fire there was a concrete alleyway about 4 feet wide, located at the end of Upland Street, which alley passed between the last house on the south side of Upland Street and the fence of the Swainsboro Lumber Yard. At the south end of this concrete alleyway was a narrow dirt path which cut through an open field and lead over some old unused tracks to the main tracks of the railroad. According to Exhibit "K" and the deposition of Mrs. Evans, this path did not cross the defendant's property. Mrs. Evans testified that this path was frequently used to go across the tracks. She further testified that after the fire all the fencing around the Swainsboro Lumber Yard was destroyed, together with five houses on the south side of Upland Street nearest to and adjoining the concrete alleyway. According to Mrs. Evans, after the fire there remained an open field especially since the five houses on the south side of Upland Street and the defendant's lumberyard were destroyed leaving only rubble and open areas. There was no testimony by Mrs. Evans, or anyone else, that either prior to or after the fire there was a path over the defendant's property leading to the railroad right-of-way. Exhibit "K" shows that the point at which the minor plaintiff was struck by the train was a few feet from the Woodland Avenue bridge and 343 feet from the closest point of defendant's property. Exhibit "K", as well as Mrs. Evans' testimony and defendant's affidavit, demonstrates that there were several open fields between the minor plaintiff's home and the railroad tracks, any one of which could be used as a path to the railroad tracks. The plaintiffs have alleged that the minor plaintiff was playing on the defendant's property and crossed defendant's property to gain access to the railroad tracks. Plaintiffs seek to hold the defendant liable for his failure to adequately assure that the minor plaintiff would not have access from defendant's property to the railroad tracks. The only evidence as to which route the minor plaintiff took to gain access to the railroad tracks is the depositions of the minor plaintiff and his mother. Those portions of the minor plaintiff's deposition which are relevant as to the route taken by him are as follows:

By Counsel for Penn Central:

Q. Now, Louis, going back to August the 6th of 1970—that is a little over a year ago—do you recall having had an accident with the train on that day?

A. You mean when it hit me?

Q. Yes. Do you remember that?

A. Nope.

Q. Do you remember anything about that day?

A. No, I don't. I know when I was sitting in the hospital the next two days unconscious.

\* \* \* \* \* \*

Q. Now going back prior to the accident before August the 6th, when is the last time you remember anything?

A. You mean . . .

Q. Before?

A. Before I got hit?

Q. Yes. Before you got hit?

A. I remember a lot of things. You mean like when the lot burned down to the ground? It was only that crossing and no trains didn't go by. So then I thought that since no trains didn't go by, that the lot burned down, that they go back there and play.

Q. Now, you recall waking up in the hospital?

A. Mm-hmm.

Q. When before you wakened in the hospital, when before that do you remember about anything that you did?

A. I don't remember anything.

\* \* \* \* \* \*

Q. Do you know whether you were with anyone when this accident happened?

A. I was with my cousin.

\* \* \* \* \* \*

Q. How did you go from your grandmother's house on Upland Street to the railroad? Did you walk?

A. I walk straight up.

Q. When you say you walked straight up, did you walk on the street or did you walk in the field, or how did you walk?

A. I walk on the pavement.

Q. Do you know what street you were on? Do you know what the name of the street was that you were on?

A. They call it Upland Street, but

\* \* \* \* \* \*

Q. Why did you go to the railroad?

A. See, I wanted some frogs. I wanted frogs.

\* \* \* \* \* \*

Q. Had you been there before?

A. Yes. When—because no trains didn't—we thought that since the lot burned down, no trains didn't run.

Q. When you say the lot burned down—lot, right?

A. A lock.

Q. A building?

A. Mm-hmm.

Q. A building burned down?

A. The man at the end of the street where they go and they get gas, and open seven o'clock in the morning, closes five o'clock.

Q. Was this a garage?

A. Yes.

Q. What do you call this garage? A lot?

A. Mm-hmm. Because cars go back in there at seven o'clock in the morning to get fixed.

Q. I see. This is a garage where cars go and get fixed?

A. Mm-hmm.

Q. Had you been to this lot before? This garage before?

A. No.

\* \* \* \* \* \*

Q. Before the day of the accident?

A. Yes. I been up there?

Q. Did you go up with your cousin?

A. No.

Q. With whom did you go up there?

A. Some friends.

\* \* \* \* \* \*

Q. Now, when did you go with them to this lot or to the garage—before the accident, that is? When?

A. I went up there a week before the accident.

Q. A week before?

A. Mm-hmm.

Q. During that week before the accident, had you gone up there?

A. Yes.

Q. You went up there again, or just that one time the week before?

A. Yes. A week before.

Q. Did you go on the railroad at that time?

A. No.

\* \* \* \* \* \*

Q. Now, when you went to the railroad, did you go down from the street where the bridge was, or did you come from some other place?

A. I came—I do not know.

Q. You don't know?

A. No.

\* \* \* \* \* \*

Q. Before you got to the railroad, can you tell me how you got there? In other words, what way you went to get there? Did you go through a lot?

A. No. I just came from the streetway.

Q. From the street?

A. Mm-hmm.

Q. Was this a street where the bridge was, or was it a different street?

A. It wasn't a street where the bridge was.

Q. It was not, you say?

A. Not.

Q. It was another street?

A. (Nods.)

Q. Do you know the name of the other street you were on?

A. Nope.

Q. Did you have to walk through anything like a field when you left the street before you got to the railroad?

A. Yes. I had to run—run where all these big rocks was.

Q. And I understand you had never been at that railroad before?

A. I only been up there about five times.

Q. At the railroad?

A. Not on the tracks. I mean at the garage.

Q. At the garage?

A. Mm-hmm.

\* \* \* \* \* \*

Q. It was dangerous to go there?

A. Once no train didn't run there, we thought that we can still go back there because the lot burned down and the trains didn't run through.

\* \* \* \* \* \*

Q. Now, you remember that you and your cousin Darrell [sic] went down to the railroad and you were going to catch frogs. Where in relationship to the tracks were you going to catch these frogs?

A. Like it was a—I do not know.

\* \* \* \* \* \*

By Plaintiffs' Counsel:

Q. Louis, you said you thought no trains run there anymore. Can you tell why you thought that?

A. Because the lock burned down to the ground. We thought no trains wouldn't run no more down there.

By Counsel for Penn Central:

Q. How far was this lock?

A. Right from the corner.

Q. From the railroad . . . .

A. Like—I do not know.

Q. Could you tell me this: Was it half a block from where the accident happened to where you were going for the frogs?

A. I do not know.

Q. Were there any tracks where this lock was? Were there any railroad tracks there?

A. There was some over in the bushes, but they wasn't no good, because half of the parts was missing.

Q. Part of the tracks were missing?

A. Yes.

Those portions of Mrs. Evans' deposition which are relevant as to the route taken by the minor-plaintiff are as follows:

By Counsel for Defendant:

Q. After the fire, I understand that the houses on Upland Street were destroyed, some houses?

A. Yes.

Q. Which allows you to have a greater area to enter the field, am I correct?

A. Yes.

Q. Before the fire you were restricted to this little alleyway?

A. Yes.

Q. After the fire then there were certain houses to the left of the alleyway as you went through it which were burned down?

A. Yes.

Q. And at that point, you could walk across any of these open lots, am I correct?

A. That's right.

\* \* \* \* \* \*

Q. Did you son ever tell you how he reached the tracks on the day of the accident?

A. No, he didn't.

Q. Did your son ever tell your husband how he reached the tracks on the day of the accident?

A. No.

Q. To your knowledge, did your son ever tell anyone how he reached the tracks on the day of the accident?

A. Yes, yes. He told me that he entered through Upland Street.

Q. Through Upland Street?

A. Yes.

Q. Did he tell you where through Upland Street he entered the tracks?

A. He said he went right up the street and right out there.

Q. Did he tell you where on Upland Street he entered?

A. At the corner of the street.

Q. Well, the houses at that point, the last houses, were burned down?

A. Yes.

Q. Is that where he entered the tracks?

A. Yes.

Q. Through the rubble of those houses?

A. Yes.

Q. Did he tell you after he crossed the rubble of those houses where he went? Did he tell you he was going down by the Woodland Avenue bridge to search for frogs?

A. No. He just said he went down to the frog pond—the frog pond like and he went down to get some frogs.

\* \* \* \* \* \*

Q. Did he [Darryl] say anything?

A. He said he gave him fifty cents and he went to make sure he got his frogs.

Q. So they went down across the rubble of these houses and down toward the frog pond; is that correct?

A. Yes.

The relevant portions of the minor plaintiff's deposition quoted above reveal that he does not remember the route which he took to reach the railroad tracks. There is nothing in the minor plaintiff's testimony which in any way links the defendant's parcel of land to the accident. There is no testimony that the minor plaintiff crossed the defend-

ant's property on the day of the accident. Minor plaintiff's mother in her deposition testified that the minor plaintiff and his cousin, Darryl, told her that on the day of the accident the minor plaintiff crossed over the rubble of the burned down houses on Upland Street on his way to catch frogs. The evidence reveals that no one witnessed the accident other than the locomotive engineman and the minor plaintiff's twelve year old cousin Darryl, who was accompanying the minor plaintiff on his trip to catch frogs. The locomotive engineman in his deposition testified that when he first saw the minor plaintiff, the minor plaintiff was on the railroad tracks at a point considerably more than 343 feet from the defendant's property.[1] No testimony is forthcoming from the minor plaintiff's cousin, Darryl, since he has been a patient at the Eastern State School and Hospital and concededly is incompetent to testify. The plaintiffs have made reference in their brief to "other testimony and evidence also pertinent to present a genuine issue of [the route he took to the accident] to a jury". Such testimony and evidence has not been forthcoming. However much we may sympathize with the minor plaintiff and his parents as a result of the unfortunate injuries he sustained, we must conclude that there is no genuine issue of material fact and no evidence of negligence on the part of this defendant and summary judgment in his favor is granted.

■ Although we find that there exists no evidence that the minor plaintiff crossed defendant's land to get to the railroad tracks and, thus, defendant is entitled to summary judgment as a matter of law, another ground exists upon which summary judgment in favor of the defendant is granted. Assuming ar-

---

1. The engineman's deposition shows that the train was on its way to Media and when he first saw the boys they were on the railroad tracks at a point on the 30th Street side of the Woodland Avenue bridge and that after he blew the train whistle and applied his emergency brake one boy got off the tracks while the other boy (minor plaintiff) ran on the tracks in a direction away from the train which overtook and struck him at a point on the Media side of the Woodland Avenue bridge.

guendo that the minor plaintiff did cross the defendant's property to gain access to the railroad tracks we have not found any law which supports a duty on the part of an adjoining landowner, the defendant in this case, to the minor plaintiff in connection with this accident.

The plaintiffs seek to hold the defendant landowner liable for injuries sustained by the minor plaintiff on the basis of an alleged dangerous condition existing on the railroad right-of-way and not on the defendant's land, a condition not created or maintained by the defendant and over which he had no control. The plaintiffs contend that because the railroad right-of-way is immediately adjacent to the defendant's unfenced land and because small children living in the vicinity have played on this land, then the law imposes upon the defendant a duty to erect a fence or other protective device on his land and provide adequate warnings to the children of the dangerous condition. Under the law of Pennsylvania, which is the substantive law the Court must apply to the evidence in this case, we have found no authority holding that a possessor of land is under such a duty.

The law of Pennsylvania as to the duty owed by a possessor of land to trespassing children has undergone considerable change since the early days when the Pennsylvania courts disposed of most child trespasser cases by holding that the possessor of land owed no duty to the child trespasser except to refrain from willfully or wantonly injuring him. The courts developed a theory imposing liability for injuries to child trespassers known as the "attractive nuisance" doctrine. Under this doctrine, the possessor of land is liable for injuries to trespassing children caused by a structure or other artificial condition maintained on the land, which the possessor knows or should know that children are likely to trespass upon without discovering the condition or realizing the risk involved. Thompson v. Reading Co., 343 Pa. 585, 23 A.2d 729 (1942);

Krepcho v. City of Erie, 145 Pa.Super. 417, 21 A.2d 461 (1941). The "attractive nuisance" doctrine applies only where the landowner brings on his land or permits thereon, something of an artificial nature which is both attractive and dangerous to children. Nichol v. Bell Telephone, 266 Pa. 463, 109 A. 649 (1920). This doctrine lends no legal support for the plaintiffs' claim since under the decided cases the "attractive nuisance" doctrine has never been extended to impose liability on landowners for conditions which exist on an adjoining third-party's property.

Another doctrine has been developed by the courts imposing liability on a possessor of land for injuries to a child trespasser. This doctrine is known as the "playground rule". The "playground rule" is based on the theory that a landowner's toleration of children on his premises for a sufficient time imposes on him a duty to use ordinary care to keep his premises safe. Prokop v. Becker, 345 Pa. 607, 29 A.2d 23 (1942). Under the "playground rule", a landowner who has knowledge or reason to believe that his premises are being used as a playground by children may be held liable for injuries to such children caused by his failure to use ordinary care in keeping the premises safe. Although there is some evidence in this case that the defendant had, or should have had, knowledge that children played on his property, the "playground rule" has never been extended to impose liability for conditions which exist on an adjoining third-party's property and thus is of no avail to the plaintiffs in this case. The Supreme Court of Pennsylvania has limited the application of the "playground rule" to accidents arising from latent dangers on the landowner's property. McHugh v. Reading Co., 346 Pa. 266, 30 A.2d 122 (1943).

In 1942, the Supreme Court of Pennsylvania adopted the rule as to trespassing children set forth in Section 339 of the Restatement of Torts. Thompson

v. Reading Co., 343 Pa. 585, 23 A.2d 729. Section 339 of the Restatement of Torts, Second, provides:

A possessor of land is subject to liability for physical harm to children trespassing thereon caused by an artificial condition upon the land if

(a) the place where the condition exists is one upon which the possessor knows or has reason to know that children are likely to trespass, and

(b) the condition is one of which the possessor knows or has reason to know and which he realizes or should realize will involve an unreasonable risk of death or serious bodily harm to such children, and

(c) the children because of their youth do not discover the condition or realize the risk involved in intermeddling with it or in coming within the area made dangerous by it, and

(d) the utility to the possessor of maintaining the condition and the burden of eliminating the danger are slight as compared with the risk to children involved, and

(e) the possessor fails to exercise reasonable care to eliminate the danger or otherwise to protect the children.

The Restatement rule eliminates the element of allurement, that is, the necessity of enticement onto the premises by the object causing the injury. Verrichia v. Society DiM.S. Del Lazio, 366 Pa. 629, 79 A.2d 237 (1951). Furthermore, it has been stated that the Restatement rule "supersedes and supplants the doctrine of 'attractive nuisance' and the 'playground rule'". Dugan v. Pennsylvania R. R. Co., 387 Pa. 25, 127 A.2d 343 (1956). In any event, the Restatement rule by its express terms is applicable only where the possessor of land has maintained on his land a structure or artificial condition which has caused harm to children. Section 339 of the Restatement is obviously limited to conditions on the land of the possessor and has never been extended by the Pennsylvania courts to the adjoining land. It therefore cannot serve as a basis upon which the plaintiffs can recover against the defendant in this case.

■ No case has been brought to our attention wherein there has been imposed upon a possessor of land a duty to erect fencing or other protective devices or warnings to deter trespassing children from entering a third person's property on which there exists a dangerous condition not created or maintained by the landowner and over which he has no control. As a matter of fact, there are cases which hold that possessors of land have no such duty. In the case of Jones v. United States, 241 F.2d 26, 28–29 (4th Cir. 1957), the Court stated:

But our attention has been directed to no authority supporting the view that it is the duty of . . . landlord to guard against conditions which exist on adjoining property.

See also Gutirrez v. Southern Pacific Co., 174 Cal.App.2d 866, 345 P.2d 326 (1959); Corcoran v. City of San Mateo, 122 Cal.App.2d 355, 265 P.2d 102 (1954); Villani v. Wilmington Parking Authority, 9 Terry 450, 106 A.2d 211 (Del.1954); Magner v. Frankford Baptist Church, 174 Pa. 84, 34 A. 456 (1896); Annot., 39 A.L.R.2d 1452 (1955). The imposition of a duty to fence one's land which adjoins a railroad right-of-way would under the facts of this case produce an incongruous result since the Pennsylvania cases hold that there is ordinarily no duty on a railroad to fence its right of way to prevent children from trespassing. Dugan v. Pennsylvania R. R. Co., 387 Pa. 25, 127 A.2d 343 (1956); Malischewski v. Pennsylvania R. R. Co., 356 Pa. 554, 52 A.2d 215 (1947).

Accordingly, the following Order is entered:

## ORDER

And now, to wit, this 25th day of April, 1975, it is ordered that the Motion

**606**

of Defendant Eugene Yaeger for Summary Judgment is granted and judgment is entered in favor of the Defendant and against the Plaintiffs together with costs. It is further ordered that the Third-Party Complaint of the Defendant against Penn Central Transportation Company, City of Philadelphia, the Estate of Edward Patterson, Deceased, Edward Patterson Lumber Company, Julia Yellin and Maurice J. Klein, Trustees, Gerson Klein and Michael Schiller, Substitute Trustees and Air Reduction Company, Incorporated is dismissed.

EXHIBIT "K"